## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| BEN BROWN & SARA BROWN | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Cause No.: 14-CV-499 |
| | ) | |
| JEANNEAU AMERICA INC | ) | |
| Serve:    Registered Agent: | ) | |
|          The Corporation Trust Incorporated | ) | |
|          at: 351 West Camden Street | ) | **JURY TRIAL REQUESTED** |
|             Baltimore, MD 21201 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SUPERIOR CHARTERS, INC. d/b/a SUPERIOR | ) | |
| YACHT SALES | ) | |
| Serve:   Cindy Kalow, Registered Agent | ) | |
|          34475 Port Superior Rd | ) | |
|          Bayfield, WI 54814 | ) | |
| | ) | |
| Defendants | ) | |

## COMPLAINT

## JURISDICTION, VENUE AND FACT

Comes now Plaintiffs, Ben Brown and Sara Brown, and for its Complaint against the

Defendants, Jenneau America Inc. and Superior Charters, Inc. d/b/a Superior Yacht Sales, states:

1.       Plaintiffs Benjamin L. Brown ("Professor Brown") and Sara M. Brown ("Sara

Brown"), hereinafter referred to collectively as "Plaintiffs", are individuals who reside in Elsah,

Illinois. Benjamin Brown is a professor of physics at Marquette University in Milwaukee,

Wisconsin.

2.       Defendant Superior Charters, Inc. ("SC") is a corporation incorporated and

existing under the laws of Minnesota, which has its principal office in Bayfield, Wisconsin, and

conducts the yacht sales portion of its business under the name of "Superior Yacht Sales," as one

1

of Jeanneau's authorized dealers.

3.      Defendant Jeanneau America, Inc. ("Jeanneau") is a corporation formed under and existing pursuant to Delaware law, which at all relevant times has maintained and continues to maintain its principal place of business in Annapolis, Maryland.

4.      This Court has original jurisdiction pursuant to 28 U.S.C. 1332 (a) (1) in that the lawsuit is between citizens of different states, and the amount in controversy exceeds $75,000.

5.      Further, this court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1333(1), which grants federal subject-matter jurisdiction over admiralty or maritime disputes, and pursuant to 46 U.S.C. § 30101(a), which extends admiralty and maritime jurisdiction of the United States to and including cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land. The incident that gives rise to this complaint occurred on the navigable waters of Lake Michigan and included the potential to affect maritime commerce by contamination of the waterway and creation of a fire hazard.

6.      This court also has federal question jurisdiction in that the warranty relating to the sailboat at issue violates the Federal Magnuson-Moss Warranty Act, and Plaintiffs claim under such Act, seeking damages in excess of $50,000.

7.      As this court has original jurisdiction, it has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all of Plaintiffs' claims that are so related that they form part of the same case or controversy.

8.      Venue is proper 28 U.S.C. § 1391(b)(2) in that a substantial amount of the events upon which the lawsuit is based took place in the Western District of Wisconsin.

9.      Benjamin and Sara Brown, by a Purchase Agreement dated February 5, 2011,

purchased a newly-manufactured Jeanneau Sun Odyssey 409 Sailboat ("the Yacht") from SC in Bayfield, WI, for a total purchase price (with options) of $268,345.75. The price of the Yacht, which the Browns financed, reflected a special "boat show" discount of $14,737. See attached purchase documents, **Exhibit 1.**

10.     On August 5, 2011, following initial commissioning of the Yacht through SC, which did not include fueling the Yacht's tank or running the Yacht's engine, Plaintiffs took ownership of the Yacht.

11.     Jeanneau, upon information and belief, warranted the Yacht for a period of two (2) years per an express written warranty, of which Plaintiffs did not receive a copy. The following are, on information and belief, the terms of Jeanneau's written warranty:

**Article 1**

At the time of delivery of the boat the parties sign the Certificate of Delivery supplied by JEANNEAU for this purpose and this is equivalent to an agreement of compliance by the purchaser-user.

The acceptance of delivery of the boat by the purchaser-user without reserve is equivalent to the acceptance of the apparent condition of the boat in pursuance of the provisions of Section 1642 of the Civil Code.

The terms of warranty are engaged only upon:

-   the return to the After Sales Department in JEANNEAU of the duly filled in tear-away section of the Certificate of Delivery and of the Warranty Registration Card,

-   the carrying out of the controls and service set forth by JEANNEAU, being made clear that the possible expenses of handling, transportation, parking, escorting which have been incurred in the execution of the above mentioned directives are born exclusively by the purchaser-user.

**Article 2**

The warranty is valid for a duration of 24 months from the date of delivery of the boat to the first purchaser-user and it is strictly limited as the manufacturer chooses, to the replacement or free repair of any part that has been found defective by the technical specialists of the latter and no compensation whatsoever shall be paid in this respect.

As for components and accessories which visibly bear the trademark of another supplier, the warranty shall be limited to the warranty provided by said supplier.

**Article 3**

With the exception of any prototype boats, RIGIFLEX boats, boats used for business purposes, or boats specifically designed and/or equipped for racing, which have as a contractual warranty only that indicated in article 2 above, the structure of the hull, the deck and the hull to deck joint and the hull to keel joint is warranted against all manufacturing defects identified by the technical specialists of JEANNEAU, for a period of 5 years for monohull boats and 3 years for motor boats and multihull boats.

However, any incident that affects the structure and does not result from a manufacturing defect covered under the conditions of warranty, that would have resulted or not in the repair of the deck or hull, shall effectively cancel all terms and conditions of warranty and without prejudice immediately.

The warranty period starts from the date of the first commissioning of the boat and at the latest from the last day of the model year in which the boat was built, i.e. August 31 of the said year.

This warranty is strictly limited to the free repair of the manufacturing defects either in our yard or by a repair shop or shipyard we authorized and no compensation whatsoever shall be paid in this respect.

**Article 4**

The following items are excluded from the terms of warranty as stated in articles 1 and 2 above:

-   The transport and carriage expenses for the boat and parts as well as expenses and/or possible losses resulting from the inability to use the boat and/or accessories, shall be born by the purchaser,

-   The deterioration or damages hereinafter listed as well as their consequences:
    - Normal wear and tear,
    - Cracks, cracking or fading of the gel coat,
    - Damages resulting from:
        -   changes and modifications or repairs, even partial, performed in workshops different from those authorized by our company,
        -   the failure to follow the recommended maintenance procedures stated in the owner's manual delivered with the boat, or failure to follow the professional procedure,
        -   improper use, in particular careless use, or rash use, misuse or abnormal use,
        -   the participation in competitive events,
        -   acts of negligence as regards to the necessity to take the necessary measures of conservation,
        -   an accident or catastrophe such as explosion, fire, flood, storm, lightning, transport, riot, theft, collision,
        -   unsuitable storage or transport conditions.

**Article 5**

The bringing into play of the warranty shall extend the period of warranty for a period equal to the one that is necessary to carry out the repair work under the warranty, on the condition that the afore-mentioned repair work requires an immobilization of the boat for minimum 7 consecutive days.

**Article 6**

In order to enjoy the above-specified warranty, the purchaser-user shall present the duly filled in Certificate of Delivery and Warranty document each time a claim is presented and in a written, precise and justified document he shall notify his authorized dealer-seller the defect or fault within 15 days from the day when the defect or fault is discovered otherwise he will not enjoy this warranty.

The authorized dealer-seller shall inform the builder about the purchaser-user's claim within a period of 8 days from its receipt otherwise he shall have to bear the consequences resulting from his delay.

**Article 7**

The authorized dealers, agents or sellers of JEANNEAU do not have the authority to alter the above warranty but, on their own account and in their own responsibility, they may grant possible additional warranties which can bind the builder under no circumstances.

12.     Following the closing on their purchase on August 5, 2011, the Plaintiffs took the Yacht for a multi-day trip with friends on the navigable waters of Lake Michigan.  On the second day of the trip, both the Browns and the friends noticed a chemical odor, but were unable to locate the source of the smell.

13.     After cruising for 5 days on the Yacht, the Plaintiffs were astonished to discover that many gallons of fuel had somehow spilled, gathered in the Yacht's bilge, and soaked into all porous surfaces with which it had come into contact.

14.     The Browns returned the Yacht to shore and, after removing as much diesel from the bilge as was possible with the means available to them, the Browns informed SC and, through SC, the manufacturer, Jeanneau,[1] of the diesel spill.

15.     SC initiated its first cleanup attempt, sending a technician who located the open auxiliary fuel valve on top of the diesel tank, which the Browns had never touched since buying the Yacht, as the source of the spill.  There was no handle on the valve, but the handle was attached with a TY wrap that had to be cut to enable the handle to be attached to the valve.

16.     After the technician closed the open valve, and SC had the valve capped (even

---

[1] Jeanneau has acknowledged the fact that the fuel tanks on the Jeanneau Sun Odyssey 409 sailboats for the model year 2010 had a leakage problem and distributed a Memorandum to that effect throughout the company and, presumably, to its dealers.

when it was in the "closed" position, it still did not completely seal the opening), SC tried three times to clean up the diesel fuel, removing several more gallons of diesel from the Yacht's bilge and using cleaning and masking chemicals to try to remove the remaining diesel fuel and control the odor that permeated the Yacht.

17.     However, some diesel fuel remained in the Yacht's bilge, and the strong odor of the diesel, along with the odor of the cleaning and masking chemicals, persisted.

18.     In the course of trying to deal with the aforementioned issues, Professor Brown developed a strong reaction to the diesel chemicals, and subsequently to the cleaning / masking chemicals used by SC to "clean up" the Yacht, to which he had been and continued to be exposed, exhibiting symptoms including, but not limited to, headaches, nausea, blurred vision, and nightmares.  These symptoms would intensify any time he was in or near the Yacht, or when around anything that had been stored on the Yacht.

19.     In addition, Professor Brown also developed a hypersensitivity to other substances, including many foods.

20.     Professor Brown, who had never before experienced symptoms or sensitivities such as these, now needed strong medication and ongoing treatment to be able to function on even a basic level.

21.     Because of Professor Brown's inability to be on the Yacht or in contact with anything that had been on the Yacht after the diesel spill, most of the work of clearing items out of the Yacht and trying to clean them, fell upon Sara Brown, and she eventually developed the same symptoms as Professor Brown, albeit to a lesser degree.

22.     The Plaintiffs did not use the Yacht after the above described incident, because Professor Brown was physically unable to be on the Yacht, the exposure to the diesel vapors and

6

other chemicals causing his symptoms to become debilitating whenever he tried to do so.

23.     The Plaintiffs informed SC and Jeanneau about their inability to use the Yacht in its contaminated state, and ultimately, put the Yacht into storage.

24.     More than half a year after the diesel spill and the SC's attempts to clean up the spill with cleaning and masking chemicals, SC had Schuss Marine Survey hire TEM, Inc. to conduct an air quality test on the sailboat.

25.     Despite the passage of such a long time period, since the spill and the "cleanup," TEM, Inc. still found a variety of volatile organic compounds in the air on the boat, including significant amounts of benzene, which is one of the chemical compounds contained in diesel fuel, and a known carcinogen. **Exhibit 2.**

26.     As a result of the above issues and SC's inability to completely remove the diesel fuel or the masking chemicals used and to restore the Yacht to a condition substantially similar to that of a brand new sailboat, and one that would have allowed Professor Brown to be physically present on the boat, it eventually became clear that the Yacht could no longer be used by the Browns.

27.     Plaintiffs had many communications with SC and Jeanneau in which they informed both of them about the continuing issues with the Yacht and how the diesel spill, followed by the chemical cleanup attempts, had made the boat un-useable to them.  During the course of these communications, Plaintiffs demanded that SC take back the contaminated boat.

28.     However, SC and Jeanneau refused to take any further action, and Plaintiffs were forced to offer the Yacht for sale.

29.     Ultimately, Plaintiffs were able to sell the contaminated Yacht for $225,000, more

than $43,000 less than their discounted purchase price,[2] and they had to pay $20,000 of those proceeds as a sales commission.

30.     During the time of their ownership of the Yacht, Plaintiffs used the Yacht only for the maiden voyage, which had to be aborted due to the diesel spill, yet they paid approximately $7,000 in loan interest, almost $5,000 in storage fees for a boat they could not use, and almost $2,000 for launching the Yacht when it was sold.

31.     Because their condominium had also been contaminated when it was used to store clothing and other items that came from the Yacht, Plaintiffs first cleaned and then replaced the carpet at a cost of approximately $2,000, in an attempt to make the condominium livable for Professor Brown.

32.     When attempts failed to rid the condominium from the contaminants carried into it from the Yacht to a degree that would have enabled Professor Brown to continue living there, the Plaintiffs were forced to sell it after having lived there for only one year, and ended up paying $25,000 in real estate brokerage fees in the process.

33.     The Plaintiffs also spent a substantial amount of money for dry cleaning of contaminated clothes, many of which ultimately had to be discarded because the irritants could not be fully removed, further contributing to the Plaintiffs' losses.

34.     Finally, Professor Brown suffered medical costs as a result of his debilitating condition.

35.     During the first months after he was contaminated, first with diesel and diesel vapors, and then with the chemicals used in cleaning up and masking the diesel odor, Professor Brown was effectively debilitated, frequently unable to work, in constant distress and discomfort, and not able to participate in normal everyday life in a meaningful way.

---

[2] About $58,000 less than the actual, undiscounted purchase price for their boat.

36.     While Professor Brown's condition has been improving significantly during the past year, he did lose his position as the chair of the physics department at Marquette University (and the $9,000 yearly stipend that goes with it) after the condition induced by the diesel spill forced him to apply for a sabbatical a year ahead of normal schedule, and he continues to suffer spells of migraine headaches, still takes prescription medicines regularly in order to function properly, and continues to suffer from hypersensitivity to certain foods and substances.

37.     After the diesel spill on the Browns' Yacht, which was not the first time the issue of the uncapped auxiliary fuel valve on this model of sailboat had come to Jeanneau's attention, Jeanneau issued a technical advisory to its authorized dealers regarding the absence of a plug on the auxiliary fuel valve on some exemplars of this model of sailboat, and directing the dealers to check for and correct this defect in the affected Jeanneau sailboats. **Exhibit 3.**

## COUNT I
### Negligence v. Jeanneau North America

38.     Plaintiffs incorporate paragraphs 1-37 of their Complaint into their Count I as if fully set out herein.

39.     Defendant Jeanneau had at all relevant times a duty to have and maintain due regard and exercise ordinary care for the Browns' safety and health, and not to allow them to become contaminated with excessive and persisting diesel vapors containing the carcinogen benzene simply as a result of operating their Yacht in the manner contemplated by the manufacturer.

40.     Plaintiffs at all relevant times exercised ordinary care in using the Yacht.

41.     Defendant Jeanneau was negligent in manufacturing and delivering to its dealer SC the Yacht with an open, uncapped and, upon information and belief, otherwise defective

9

auxiliary valve on top of the fuel tank, which allowed large amounts of diesel fuel to spill into the Yacht's bilge when the Yacht was leaning sideways during normal sailing, which in turn created a fire hazard, contamination of the Yacht, potential contamination of the waterway in which it sailed, and strong and persistent diesel vapors which came into contact with the Browns' skin, eyes, respiratory passages and other bodily systems.[3]

42.     The negligence of Defendant Jeanneau proximately caused Professor Brown, and to a lesser degree, Sara Brown, to suffer the medical conditions and symptoms set forth in paragraphs 18-20 above. Professor Brown's injuries were severe and some are of a permanent and lasting nature. As a result, Professor Brown became ill, incapacitated and disordered and will likely remain disordered the remainder of he life (he is presently 64 years old). He also suffered great pain and was prevented from attending to his usual and ordinary affairs and duties.

43.     The negligence of Defendant Jeanneau proximately caused Professor Brown to seek medical attention from his providers and incur past and in the future costs.

44.     The negligence of Defendant Jeanneau proximately caused the Browns to sell both their contaminated boat and their contaminated condominium, to discard most of their clothing, and to replace the carpet in their condominium to avoid continuing contamination with the toxic chemicals soaked into the clothes on the ship after the diesel spill and during the chemical cleanup procedures.

45.     By reason of the facts herein alleged the Browns have been damaged in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, Plaintiffs pray for entry of judgment against Defendant Jeanneau

---

[3] Because SC, on information and belief, acted as Jeanneau's agent in trying to clean up the spilled diesel on the Brown's boat, Jeanneau is also liable for SC's negligence in using cleaning and masking chemicals to "clean up" the boat in full knowledge of the fact that Professor Brown had already developed a severe reaction to the volatile chemicals present after the diesel spill, as set out in Count II, infra.

America for damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, plus the costs of this action and such other and further relief as this Court deems just.

## COUNT II
## NEGLIGENCE V. SUPERIOR CHARTERS D/B/A SUPERIOR YACHT SALES

46.     Plaintiffs incorporate paragraphs 1-45 of their Complaint into paragraph 46 of their Count II as if fully set out herein.

47.     Defendant SC, as the authorized dealer of Jeanneau, upon information and belief, at all relevant times had and continues to have the right, power and authority under its contract with Jeanneau to advertise and sell Jeanneau sailboats to the general public.

48.     SC did in fact sell the Jeanneau Yacht here at issue to the Plaintiffs and delivered it to them with an open, uncapped and, upon information and belief, otherwise malfunctioning auxiliary valve on top of the ship's diesel tank.

49.     After the diesel spill in the Brown's Yacht resulting from the open, uncapped and, upon information and belief, otherwise defective fuel valve, SC cleaned or arranged for others to remove spilled diesel from the ship's bilge, using chemicals to clean the bilge and to mask the diesel smell, even though it was aware that Professor Brown had developed a severe reaction to the chemical compounds released in the diesel spill.

50.     The diesel, which also had soaked into all porous surfaces with which it came into contact, was not completely removed, and additional cleaning and masking components were added during SC's cleanup efforts to the chemical cocktail contained in the vapor stemming from the diesel spill.

51.     Defendant SC had at all relevant times a duty to have and maintain due regard and exercise ordinary care for the Browns' safety and health and not to allow them to become contaminated with excessive and persisting diesel vapors, including the carcinogen benzene,

simply as a result of operating their Yacht in the manner contemplated by the manufacturer.

52.     Knowing that Professor Brown had already developed a strong adverse reaction to the vapors released by the spilled diesel fuel, Defendant SC had a duty to conduct the removal of the spilled diesel from the boat and the subsequent cleanup of the boat thoroughly, and in a manner that would not add additional volatile chemicals to the already contaminated ship environment.

53.     Defendant SC was negligent in selling and delivering to the Plaintiffs the Yacht with an open, uncapped and, upon information and belief, otherwise defective auxiliary valve on top of the fuel tank, which allowed large amounts of diesel fuel to spill into the ship's bilge when the ship was leaning sideways during normal sailing, which in turn created both a fire hazard and strong and persistent diesel vapors which came into contact with the Browns' skin, eyes, respiratory passage and other bodily systems.

54.     SC was further negligent in failing to remove the entire spilled diesel from the sailboat, and in using cleaning and masking chemicals during the cleanup, which exacerbated Professor Brown's original, severe reaction to the diesel vapors.

55.     The negligence of Defendant SC proximately caused the Plaintiffs to suffer the medical conditions and symptoms set forth in paragraphs 18-21 above. Professor Brown's injuries were severe and some are of a permanent and lasting nature. As a result, Professor Brown became ill, incapacitated and disordered and will likely remain disordered the remainder of he life (he is presently 64 years old). He also suffered great pain and was prevented from attending to his usual and ordinary affairs and duties.

56.     The negligence of Defendant SC proximately caused Professor Brown to seek medical attention from his providers and incur past and future medical costs.

57.     The negligence of Defendant SC proximately caused the Browns to sell both their contaminated Yacht and their contaminated condominium, to discard most of their clothing and to replace the carpet in their condominium to avoid continuing contamination with the toxic chemicals soaked into the clothes on the ship after the diesel spill and during the chemical cleanup procedures.

58.     Plaintiffs at all relevant times exercised ordinary care in using the Yacht.

59.     By reason of the facts herein alleged the Browns have been damaged in excess of One Hundred Thousand ($100,000.00) Dollars.

60.     At all relevant times, the Browns were unaware of the open, uncapped, and, upon information and belief, otherwise defective auxiliary valve on the fuel tank, and of the chemicals used by SC to clean up the diesel spill and to mask the diesel odor.

WHEREFORE, Plaintiff, the Browns pray for entry of judgment only against Defendant Superior Charters, Inc. d/b/a Superior Yacht Sales for damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, plus the costs of this action and such other and further relief as this Court deems just.

**COUNT III**
**Strict Product Liability In Tort – Manufacturing Defect And Failure to Warn - v. Jeanneau North America and Superior Charters, Inc. d/b/a Superior Yacht Sales**

61.     Plaintiffs incorporate paragraphs 1-60 of their Complaint into paragraph 61 of Count III as if fully set out herein.

62.     The Yacht manufactured with an open, uncapped and, upon information and belief, otherwise defective auxiliary fuel valve, was an unreasonably dangerous product because of its propensity to cause significant diesel spills, creating a fire hazard and contamination of the boat and those traveling in it when the Yacht was swaying from side to side under normal sailing

conditions.

63.     The Yacht with the aforementioned defective auxiliary valve assembly was an unreasonably dangerous one from the time it left Jeanneau's factory, through the possession and control of SC and until and through the time it was delivered to and used by the Plaintiffs.

64.     It would have been easy for Jeanneau to avoid the dangerous condition simply by manufacturing the Yacht with a capped auxiliary fuel valve, just as it would have been for SC to add a plug or cap to the valve upon delivery to it, as all Jeanneau distributors did once several diesel spills had occurred.

65.     At all relevant times before the contamination, the Plaintiffs did not know that their newly acquired sailboat was outfitted with an open, uncapped and, upon information and belief, otherwise defective auxiliary fuel valve which would allow diesel fuel to leak out of the Yacht's tank.

66.     Upon information and belief, Jeanneau knew, and SC should have known, of the fact that some of the Sun Odyssey 409 sailboats were manufactured by Jeanneau without plugs or caps on the auxiliary fuel valves at the time Plaintiffs took possession of their boat, as there had been at least on prior diesel spill resulting from that exact defect.

67.     Plaintiffs had no such knowledge until after the diesel spill in their sailboat, when they learned about the prior similar incident from a representative of Jeannaeu.

68.     Both Jeanneau and SC owed Plaintiffs the duty to warn them of the existence of an uncapped auxiliary fuel valve on top of their ship's diesel tank which would lead to dangerous diesel spills if the valve was either in the open position (which it was when the ship was delivered to the Plaintiffs), or if the valve were to ever fail (which, on information and belief, was also the case).

69.     The open, uncapped and, upon information and belief, otherwise defective auxiliary fuel valve, as well as Jeanneau's and SC's failure to warn the Browns of the danger of diesel spills due the defective condition, proximately caused damage to the Browns' Yacht, their clothes, furnishings, floor covers and other items.

70.     In addition, the open, uncapped and, upon information and belief, defective auxiliary fuel valve, as well as Jeanneau's and SC's failure to warn the Browns of the danger of oil spills due the defective condition, proximately caused Professor Brown, and to a lesser degree, Sara Brown, to suffer the medical conditions and symptoms set forth in paragraphs 18-21 above.

71.     Professor Brown's injuries were severe and some are of a permanent and lasting nature, as a result of which Professor Brown became ill, incapacitated and disordered and will likely remain disordered the remainder of his life.

72.     Professor Brown also suffered great pain and was prevented from attending to his usual and ordinary affairs and duties, both in his professional and private life.

73.     The aforementioned acts and omissions by Defendants Jeanneau and SC proximately caused Professor Brown to seek medical attention from his providers and incur past and future medical costs.

74.     The aforementioned acts and omissions by Defendants Jeanneau and SC proximately caused Plaintiffs to sell both their contaminated Yacht and their contaminated condominium and to discard many of their clothes and some of their furnishings to avoid continuing contamination with the chemicals released in the diesel spill and the subsequent cleaning efforts by SC.

75.     By reason of the facts herein alleged the Plaintiffs have been damaged in excess

of the sum of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, Plaintiffs pray for entry of judgment against Defendants Jeanneau America and Superior Charters, Inc. d/b/a Superior Yacht Sates, jointly and severally, for compensatory damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, plus the costs of this action and such other and further relief as this Court deems just.

**COUNT IV**
**BREACH OF LMPLIED WARRANTY OF MERCHANTABILITY (WIS.STAT. 402.314)**
**AGAINST SC AND JEANNEAU**

76.     Plaintiffs incorporate paragraphs 1 through 75 into their paragraph 76 as if fully set out herein.

77.     The Plaintiffs bought their Yacht from SC, which was selling it as the authorized dealer of the boat's manufacturer, Jeanneau.

78.     SC and Jeanneau at all relevant times were "merchants" of the sailboat as defined in the Wisconsin Uniform Commercial Code.

79.     Wisconsin law implies a warranty of merchantability where a merchant sells a product and does not validly exclude such warranty.

80.      Jeanneau at all relevant times was a "manufacturer" of the Yacht as defined in the Wisconsin Uniform Commercial Code.

81.     Plaintiffs at all relevant times were natural persons who suffered personal injuries because the Yacht manufactured by Jeanneau was not fit for its ordinary purpose or typical use.

82.     Jeanneau as a manufacturer is deemed under Wisconsin law to have impliedly warranted the Yacht's merchantability to Plaintiffs as third party consumers where the third party consumer is a natural person who has been injured in person by the breach of the warranty.

83.      The sailboat was not of merchantable quality as it contained an open, uncapped

16

and, on information and belief, otherwise defective auxiliary fuel valve, and ultimately poisoned its buyers, and had to be sold so as to end the cycle of ongoing exposure to the lingering chemical vapors resulting from the diesel spill.

84. The breach of the implied warranty of merchantability by Defendant SC proximately caused Professor Brown, and to a lesser degree, Sara Brown, to suffer the medical conditions and symptoms set forth in paragraphs 18-21 above. Professor Brown's injuries were severe and some are of a permanent and lasting nature.

85. The breach of the implied warranty of merchantability by Defendant Jeanneau proximately caused Professor Brown, and to a lesser degree, Sara Brown, to suffer the medical conditions and symptoms set forth in paragraphs 18-21 above. Professor Brown's injuries were severe and some are of a permanent and lasting nature.

86. As a result, Professor Brown became ill, incapacitated and disordered and will likely remain disordered the remainder of his life.

87. He also suffered great pain and was prevented from attending to his usual and ordinary affairs and duties, both in his professional and in his private life.

88. The breach of the implied warranty of merchantability by Defendants SC and Jeanneau proximately caused Professor Brown to seek medical attention from his providers and incur past and future medical costs.

89. The breach of the implied warranty of merchantability by Defendants SC and Jeanneau proximately caused the Plaintiffs to sell both their contaminated Yacht and their contaminated condominium, and to discard most of their clothing and other furnishings and floor covers that had been contaminated by the spilled diesel to avoid continuing contamination to the toxic chemicals to which Professor Brown had developed a severe and lasting reaction.

90.    By reason of the facts herein alleged, the Browns have been damaged in excess of the sum of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, Plaintiffs pray for entry of judgment against Defendants Jeanneau America and Superior Charters d/b/a/ Superior Yacht Sales, jointly and severally, for damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, and for such other and further relief as this Court deems just.

## COUNT V
## MAGNUSON-MOSS WARRANTY ACT 15 USC 2301. *ET* SEQ. V. JEANNEAU AND SC

91.    Plaintiffs incorporate paragraphs 1 through 90 of their Complaint into paragraph 91 of their Count V as if fully set out herein.

92.    The Plaintiffs were the buyers of the Yacht at issue, Defendant Jeanneau was the manufacturer and Defendant SC was the seller of the Yacht to Plaintiffs.

93.    Jeanneau provided an express written warranty for the Yacht, and both Jeanneau and  SC are deemed under Wisconsin law to have impliedly warranted its merchantability.

94.    The federal Magnuson-Moss Warranty Act ("Magnuson-Moss"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

95.    Magnuson-Moss provides a cause of action for breach of warranty. 15 U.S.C. § 2310(d)(1).

96.    Jeanneau and SC have breached their respective warranties to provide goods that are free from defects, and Plaintiffs have suffered damages as a result of such breaches.

97.    Jeanneau's written warranty, which, upon information and belief, was not denominated as either "full" or "limited," and which Plaintiffs did not receive prior to or contemporaneously with their purchase, either due to Jeanneau's failure to provide it along with their product, or due to SC's failure to make it available to the Plaintiffs (both violations

pursuant to 16 C.F.R. 702.3), contains terms purportedly limiting its liability relative to defects in its product to repair or replacement of the defective product component, at Jeanneau's option.

98.     These terms appear in the same font and type-size as the rest of the terms of the warranty, they are not bolded, and they are not printed in a contrasting color. They are, therefore, inconspicuous, and that lack of conspicuousness violates Magnuson-Moss. 15 U.S.C. § 2302(a); 15 U.S.C. § 2304(a)(3).

99.     To the extent that these terms may be intended to exclude liability for consequential damages, they fail to meet "the Federal minimum standards for warranty, and, accordingly, they are not enforceable. *See* 15 U.S.C. § 2304(a)(3).

100.    To the extent that language in Jeanneau's written warranty limiting the warranty to "the replacement or free repair of any part that has been found defective […]" is intended to exclude liability for consequential and incidental damages, it cannot achieve that goal as there is no clear statement that consequential and incidental damages are excluded, and the language limiting the warranty to replacement or repair of the defective part is in the same font and type-size as the rest of the terms of the warranty, is not bolded, and is not printed in a contrasting color.

101.     In short, the language as such is insufficient to operate as an exclusion of consequential damages, and is also inconspicuous, and that lack of conspicuousness violates Magnuson-Moss.

102.    Where these terms purport to exclude liability for consequential damages, they fail to meet "the Federal minimum standards for warranty, and, accordingly, they are not enforceable. *See* 15 U.S.C. § 2304(a)(3). The inconspicuous and unclear language is also ineffective as a disclaimer of the implied warranty of merchantability. 15 U.S.C. § 2308(a) and

(c).

103.    In addition, the Plaintiffs do not recall receiving a written warranty document before, at, or around the time that the Yacht was purchased, nor do they recall seeing any copies of the warranty documents displayed on SC's premises.

104.    Instead, they requested the certificate of closing and warranty documents from SC several times without success.

105.     To the extent Jeanneau's written warranty was intended to be a full warranty (and due to the absence of identifying language it would have to be deemed to purport to be a full warranty), the imposition of a requirement for the Browns to return a Warranty Registration Card as was required, upon information and belief, by Article 1 of Jeanneau's written warranty, was in violation of the Magnuson-Moss Warranty Act. See 16 C.F.R. § 700.7. This is all the more true since the Browns did not even receive the Certificate of Delivery which contained the registration card.

106.    Jeanneau's failure, upon information and belief, to identify in its written warranty the address of the warrantor and the exact warranty procedure also violates the Magnuson-Moss Warranty Act, 16 C.F.R. 701.3 (a) (5), as does the absence of the statements listed in 16 C.F.R. 701.3 (a) (8) and (9).

107.    The failure of Jeanneau and SC to assure that Jeanneau's written warranties were made readily available for examination by prospective buyers violates Magnuson-Moss. 16 C.F.R. § 702.3.

108.    SC breached its implied warranty of merchantability in regards to the Yacht, as did Jeanneau.

109.    SC also did not allow the Browns to recoup their purchase price or exchange the

Yacht after multiple attempts at restoring the boat to its warranted condition had failed, all in violation of section 2304 (a) (4) of the Magnuson-Moss Act.

110.    The acts and omissions of Jeanneau and SC in violation of Magnuson-Moss are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and, accordingly, they are unlawful. 15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

111.    Plaintiffs have suffered damages as a result of the respective breaches of warranty by Jeanneau and SC and their failures to comply with their lawful obligations under the written and implied warranties by, including, but not limited to, refusing to pay for Plaintiffs' costs resulting from its and SC's inability to remove the diesel and diesel vapors, as well as the vapors resulting from the chemical cleanup of the diesel spill, and the resulting failure to bring the sailboat into a condition that would have enabled the Browns to continue using it.

112.    By reason of the facts herein alleged the Browns have been damaged in excess of One Hundred Thousand ($100,000.00) Dollars.

113.    Magnuson-Moss also provides for an award of costs and expenses, including attorney's fees, to prevailing consumers in connection with the commencement and prosecution of lawsuits thereunder, unless the Court in its discretion determines that such an award would be inappropriate. 15 U.S.C. § 2310(d)(2).

114.    Plaintiffs intend to seek such an award as prevailing consumers at the conclusion of this lawsuit.

WHEREFORE, Plaintiffs, the Browns, pray for entry of judgment against Defendants SC and Jeanneau, jointly and severally, for damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, for their costs and attorneys' fees incurred in this action, and

for such other and further relief as this Court deems just.

## COUNT VI
## BREACH OF CONTRACT (THE BROWNS V. SC)

115.    Plaintiffs incorporate paragraphs 1 through 114 into their paragraph 115 as if fully set out herein.

116.    Plaintiffs entered into a contract for the purchase of a Jeanneau Sun Odyssey 409 Sailboat on February 9, 2011 ("the Contract"). See Exhibit 1.

117.    Pursuant to the Contract, the Plaintiffs were to pay the purchase price, as subsequently finalized, and SC was to deliver to the Browns and commission a newly manufactured 2011 Jeanneau Sun Odyssey 409 Sailboat.

118.    The Plaintiffs paid the agreed upon final purchase price of $268,345.75 and otherwise complied with all of their duties under the Contract.

119.    SC breached the Contract in that the Yacht it delivered was defective due to the existence of an open, uncapped and, upon information and belief, otherwise defective auxiliary fuel valve on top of the boat's diesel tank, which caused diesel to spill into the Yacht during normal operation.

120.    SC also breached the Contract by failing, during the commissioning period, (1) to notice the open, uncapped fuel valve, and to close it and cap it, and (2) by failing to instruct the Browns on the existence of such uncapped fuel valve, and the dangers associated with it.

121.    As a direct result of SC's breaches, the Browns' boat became damaged, decreased greatly in value, and unusable by the Plaintiffs, and the Plaintiffs  incurred medical costs, interest costs, and storage fees for the Yacht they could no longer use.

122.     In addition, the Plaintiffs were forced to incur costs for dry cleaning of clothes and other belongings, and for replacing many clothes and other contaminated items, and for

selling both their unusable Yacht and their condominium, which Professor Brown could no longer inhabit due to the chemical contamination caused by items that were brought into the home from the sailboat after the diesel spill.

123.     As a direct result of SC's breaches, the Browns suffered damages in an amount of in excess of One Hundred Thousand ($100,000.00) Dollars.

WHEREFORE, Plaintiffs, pray for entry of judgment against Defendant SC for damages in an amount in excess of One Hundred Thousand ($100,000.00) Dollars, and for such other and further relief as this Court deems just.

## COUNT VII
## LOSS OF CONSORTIUM (SARA BROWN V. JEANNEAU AND SC)

124.     Plaintiff Sara Brown incorporates paragraphs 1 through 123 of the Complaint into paragraph 124 of her Count VII as if fully set out herein.

125.     At all relevant times, Plaintiffs Sara and Ben have been husband and wife.

126.     The acts and omissions by Defendants Jeanneau and SC, as set out above, resulted in a wrongful injury to Professor Brown, Sara Brown's beloved husband, which injury left him ill, incapacitated, disordered, and unable to function at a normal level.

127.     Before suffering these injuries, Professor Brown was able to and did perform all the duties of a husband, including assisting in maintaining the home, and providing love, companionship, affection, society, sexual relations, moral support, and solace to Plaintiff Sara Brown.

128.     As a result of Professor Brown's impairments resulting from the injury caused by defendants, Sara Brown was deprived of her husband's love and affection, his companionship and society, the privileges of sexual relations, the material services normally rendered by her husband, and of other privileges and comforts that normally come with a close, intimate, and

harmonious marriage relationship such as that between the Plaintiffs.

129.    While Professor Brown's condition improved throughout the past year, he continues to be impaired as a result of his reaction to the contamination with diesel vapors and other chemicals, as set out above, and, as a result, Sara Brown periodically continues to be deprived of the marital privileges set out in the preceding paragraph.

WHEREFORE, Plaintiff Sara Brown prays for entry of judgment against Defendants SC and Jeanneau, jointly and severally, for damages in accordance with proof to be made, including any incidental (including attorneys' fees and expenses) damages, plus the costs of this action, and for such other and further relief as this Court deems just.

**REINERT WEISHAAR & ASSOCIATES, P.C.**

**BY:**     /s/ Boris A. Kaupp____
Boris A. Kaupp, #53631MO
812 North Collins, Laclede's Landing
St. Louis, Missouri  63102
(314) 621-5743 Telephone
(314) 621-8071 Facsimile
bkaupp@rwalawfirm.com
*Attorneys for Ben Brown and Sara Brown*